```
1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF RHODE ISLAND
2


3

4   * * * * * * * * * * * * * * CR NO. 16-111-WES
                                *
5   UNITED STATES OF AMERICA  *
                                *
6   VS.                         * JUNE 7, 2017
                                *
7   RAFAEL P. LEAL              *
                                *
8   * * * * * * * * * * * * * * PROVIDENCE, RI

9

10

11           BEFORE THE HONORABLE WILLIAM E. SMITH

12                        CHIEF JUDGE

13                  (Change of Plea Hearing)

14

15
```

16  **APPEARANCES:**

```
17  FOR THE GOVERNMENT:        JOHN P. McADAMS, AUSA
                               U.S Attorney's Office
18                             50 Kennedy Plaza, 8th Floor
                               Providence, RI  02903
19

20  FOR THE DEFENDANT:         OLIN W. THOMPSON, AFPD
                               Federal Defender's Office
21                             10 Weybosset Street, Suite 300
                               Providence, RI  02903
22

23  Court Reporter:            Denise P. Veitch, RPR
                               One Exchange Terrace
24                             Providence, RI  02903

25
```

7 JUNE 2017 -- 11:00 A.M.

THE COURT:  Good morning.  This is the matter of the United States versus Rafael Leal.  We're here for a change of plea this morning.  Let's have counsel identify themselves for the record, please.

MR. McADAMS:  Good morning, your Honor.  John McAdams on behalf of the United States.

MR. THOMPSON:  Good morning, your Honor.  Olin Thompson for Mr. Leal.  I'm standing in today for Kevin Fitzgerald.  He's in a hearing before Judge McConnell this morning.

THE COURT:  Very well.

All right.  Mr. Leal, would you please stand up and be sworn in by the clerk.

(Defendant sworn)

THE CLERK:  Please state your name and spell your last name for the record

THE DEFENDANT:  Rafael, last name L-e-a-l.

THE CLERK:  Thank you.

THE COURT:  All right.  Mr. -- is it Leal?  Is that how you pronounce it?

THE DEFENDANT:  It's Leal ("lay-AL").

THE COURT:  Leal.

THE DEFENDANT:  Yes.

THE COURT:  All right.  Mr. Leal, you've been

1    sworn in by the clerk, and I'm going to ask you a

2    series of questions.  You're expected to answer my

3    questions truthfully.  If you fail to answer my

4    questions truthfully it could lead to additional

5    charges against you for perjury or making a false

6    statement.  Do you understand that?

7         THE DEFENDANT:  Yes, I do, your Honor.

8         THE COURT:  Okay.  State your name again,

9    please.

10        THE DEFENDANT:  Rafael Leal.

11        THE COURT:  How old are you?

12        THE DEFENDANT:  I'm 39.

13        THE COURT:  How far did you go in school?

14        THE DEFENDANT:  I went all the way to college.

15        THE COURT:  And where was that?

16        THE DEFENDANT:  In Brazil.

17        THE COURT:  Brazil?

18        THE DEFENDANT:  Yes.

19        THE COURT:  Okay.  Have you been treated

20   recently for any mental illness or addiction to

21   narcotic drugs of any kind?

22        THE DEFENDANT:  No.

23        THE COURT:  Are you currently under the

24   influence of any drugs or alcohol of any kind?

25        THE DEFENDANT:  No, I'm not.

1  THE COURT:  Have you received a copy of the

2  Government's charge against you, the document that is

3  labeled Indictment?

4  THE DEFENDANT:  Yes, I did.

5  THE COURT:  And do you feel you understand the

6  nature of the Government's charges against you?

7  THE DEFENDANT:  Yes, I do.

8  THE COURT:  Okay.  Now, you do not have a plea

9  agreement in this case; is that right?

10  THE DEFENDANT:  Yes.

11  THE COURT:  Okay.  All right.  So have you had

12  an opportunity to discuss the charges against you and

13  the consequences of pleading guilty with your attorney,

14  Mr. Fitzgerald, and/or Mr. Thompson?

15  THE DEFENDANT:  Yes, I did.

16  THE COURT:  Were they able to answer all of your

17  questions to your satisfaction?

18  THE DEFENDANT:  Yes, they did.

19  THE COURT:  About both the charge and about the

20  decision to plead guilty?

21  THE DEFENDANT:  Yes.

22  THE COURT:  All right.  Now, are you fully

23  satisfied with all of the representation that you've

24  received in this case from Mr. Thompson and

25  Mr. Fitzgerald?

1    THE DEFENDANT:  Yes, I am.

2    THE COURT:  Now, has anyone made any promises to

3    you in order to get you to plead guilty in this case?

4    THE DEFENDANT:  No, they did not.

5    THE COURT:  Has anyone threatened you in any way

6    to get you to plead guilty in this case?

7    THE DEFENDANT:  No, they did not.

8    THE COURT:  Is your decision to plead guilty

9    your own decision that you're making because you think

10   it's in your best interest to do so?

11   THE DEFENDANT:  Yes, it is.

12   THE COURT:  All right.  Now, you said that you

13   were educated in Brazil.  Are you a United States

14   citizen or not?

15   THE DEFENDANT:  No.  I have the green card.

16   THE COURT:  You have a green card?

17   THE DEFENDANT:  Yes.

18   THE COURT:  So you understand that your plea of

19   guilty in this case may have immigration consequences

20   for you?

21   THE DEFENDANT:  Yes.

22   THE COURT:  All right.  And you've discussed

23   that fully with your attorneys?

24   THE DEFENDANT:  Yes, I did.

25   THE COURT:  All right.

1        Now, Mr. McAdams, do you have the statutory

2   maximum penalties --

3        MR. McADAMS:  Yes, your Honor.

4        THE COURT:  -- that you could put on the record

5   for me, please.

6        MR. McADAMS:  Yes, your Honor.

7        Your Honor, Count I of the indictment charges

8   the Defendant with using the mail and means of

9   interstate and foreign commerce to coerce or entice a

10  minor into engaging in illegal sexual conduct in

11  violation of Title 18 United States Code

12  Section 2422(b).  The maximum penalties for that

13  offense are a minimum of 10 years imprisonment up to a

14  maximum of life in prison, a $250,000 fine, a $100

15  special assessment, plus there is a special victim

16  special assessment which is mandatory in the amount of

17  $5,000 if the Court determines the Defendant is not

18  indigent.  The Defendant is obviously represented by

19  the Federal Defender in this case, so there's been a

20  preliminary finding that he is indigent.

21       With respect to Count II, the Defendant is

22  charged with traveling in interstate commerce for the

23  purpose of engaging in illicit sexual conduct with a

24  minor in violation of Title 18 United States Code

25  Section 2423(b).  The maximum penalty for that offense

1    is 30 years imprisonment, a $250,000 fine, a $100

2    mandatory special assessment, plus the same $5,000

3    special victims assessment if the Court determines that

4    the Defendant is not indigent.  Both offenses carry up

5    to a period of lifetime supervised release.

6         THE COURT:  Thank you.  All right.

7         So, Mr. Leal, the maximum penalties in this

8    case, you just heard them set off by Mr. McAdams, but

9    if the penalties were imposed consecutively, back to

10   back, and what that means is a maximum term of life

11   plus 30 years of imprisonment, lifetime supervised

12   release, special assessments of essentially $10,200,

13   assuming you're adjudged to be not indigent, and a fine

14   of $500,000.  Do you understand those are the maximum

15   penalties that could be imposed under the law?

16        THE DEFENDANT:  Yes, I do.

17        THE COURT:  All right.  Now, you understand what

18   supervised release is?

19        THE DEFENDANT:  Not really.

20        THE COURT:  Do you know what probation is?

21        THE DEFENDANT:  Yes, I do.

22        THE COURT:  All right.  Supervised release is

23   like probation.  It's a period of time that follows any

24   period of incarceration during which there would be

25   conditions that you would be required to comply with.

1    Now, in your case supervised release, if there is a

2    period of supervised release, would be an extended

3    period of time.  It could go up to a period of life.

4    The conditions could be very extensive and failure to

5    comply with any of those conditions would result in

6    additional time in prison for you.  Do you understand

7    that?

8         THE DEFENDANT:  Yes, I do.

9         THE COURT:  And one of those conditions would

10   likely be that if you were to be deported you would not

11   be able to return to the United States, and so what

12   that would mean is if you were to return without

13   permission then you would be incarcerated.  Do you

14   understand that?

15        THE DEFENDANT:  Yes, I do.

16        THE COURT:  All right.  Now, you understand the

17   special assessments that I just mentioned and that

18   Mr. McAdams put on the record.  In this case there's

19   both the standard special assessments of $100 per

20   count, but then there's an additional special

21   assessment of $5,000 per count.  Those special

22   assessments are mandatory, they're not discretionary on

23   the Court, which means that I must impose them on you.

24   Do you understand that?

25        THE DEFENDANT:  Yes, I do.

1    MR. THOMPSON:  Judge, I'm sorry, just for the

2 record, we're not agreeing that the $5,000 on each

3 count is mandatory.  Your Honor does have to make a

4 finding --

5    THE COURT:  Of non-indigency.

6    MR. THOMPSON:  -- of non-indigency to impose

7 that.

8    THE COURT:  And I should have said that, and

9 you're corrected in saying that, so thank you.

10    There's also in this case a minimum mandatory

11 term of imprisonment of 10 years, which means that

12 regardless of any other factors the sentence can't be

13 less than 10 years, and you understand that?

14    THE DEFENDANT:  Yes, I do.

15    THE COURT:  Now, have you spoken to Mr. Thompson

16 or Mr. Fitzgerald about the federal sentencing

17 guidelines and how they work and how they may apply in

18 this case?

19    THE DEFENDANT:  Yes.

20    THE COURT:  Okay.  So let me ask you a few

21 questions about that just to make sure you understand

22 how the guidelines work.  First of all do you

23 understand that the federal sentencing guidelines are

24 advisory, not mandatory.  What that means is that I

25 have to give consideration to the guidelines, but I'm

1    not required to follow them; so, as a practical matter,

2    that means the sentence in this case may be within the

3    guideline range that applies, or it could be higher, it

4    could be lower.  Now, if the sentence I impose is

5    higher than the guideline range or higher than what you

6    thought it was going to be or what anyone told you to

7    expect for whatever reason, you don't get to take back

8    your plea of guilty once you enter it today.  Do you

9    understand that?

10            THE DEFENDANT:  Yes, I do.

11            THE COURT:  You also understand that anything

12   you've been told about how the guidelines apply are

13   only estimates.  We won't know exactly how the

14   guidelines apply to your case until the Office of

15   Probation conducts its presentence investigation and

16   issues its report.  You'll have a chance to read that

17   report along with your attorneys and file any

18   objections that you believe are appropriate.  Once I

19   rule on those objections and accept the report, that's

20   when we know how the guidelines apply.  So once again,

21   if it turns out that the actual guideline applications

22   are different than what you were told to expect, you

23   don't get to take back your plea of guilty once you

24   enter it today.  Do you understand all that?

25            THE DEFENDANT:  Yes, I do.

1        THE COURT:  Now, you understand there's no such

2    thing as parole in the federal system, and what that

3    means is whatever sentence you receive, that's the

4    sentence you'll actually serve.  Do you understand

5    that?

6        THE DEFENDANT:  Yes, I do.

7        THE COURT:  You also understand that under some

8    circumstances either you or the Government may have the

9    right to appeal the sentence I impose if, for example,

10    you believe that the sentence I impose is illegal or

11    unfair for any reason.  Do you understand that?

12        THE DEFENDANT:  Yes, I do.

13        THE COURT:  Now, you have a number of very

14    important constitutional rights that you give up by

15    entering a plea of guilty.  I'm going to go through

16    those rights with you now just to make sure you

17    understand what it is that you're giving up.

18        First of all you have the right to plead not

19    guilty to the offenses that you're charged with and to

20    persist in that plea to a trial.  A trial could be

21    before a judge or a jury.  Do you understand that?

22        THE DEFENDANT:  Yes, I do.

23        THE COURT:  In a trial you would be presumed to

24    be innocent of the charges against you, and it would be

25    the Government's burden to prove your guilt beyond a

1  reasonable doubt.  Do you understand that?

2  THE DEFENDANT:  Yes, I do.

3  THE COURT:  And at trial you would have the

4  right to see and hear all witnesses who would testify

5  against you and to have them cross-examined by your

6  attorney and to otherwise be represented by an attorney

7  throughout the trial.  Do you understand that?

8  THE DEFENDANT:  Yes, I do.

9  THE COURT:  And at trial you would have the

10  right to testify on your own behalf if you wished to do

11  so, or you could exercise your constitutional right to

12  remain silent and not testify.  If you chose to remain

13  silent and not testify, the Government would not be

14  permitted to use your silence against you to try to

15  prove your guilt.  Do you understand that?

16  THE DEFENDANT:  Yes, I do.

17  THE COURT:  Finally, at trial you would have the

18  right to use the power of the court to obtain documents

19  or other items of evidence or compel witnesses to come

20  to court and testify if you thought any of that would

21  be helpful to your defense.  Do you understand that?

22  THE DEFENDANT:  Yes, I do.

23  THE COURT:  By entering this plea of guilty

24  today, you're giving up each and every one of these

25  constitutional rights that I just described to you and

1   you're saying to me that you do not want a trial in

2   this case.  Is that what you want to do?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Okay.  All right.  I'm going to ask

5   Mr. McAdams now to come forward.  He's going to put on

6   the record the legal elements the Government must prove

7   in order to prove you guilty of these charges, and then

8   he's going to set forth the facts that the Government

9   says it would prove if this case were to go to trial.

10  I want you to listen carefully to the facts that he

11  describes because when he's done I'm going to ask you

12  if you agree that those are the facts of this case.

13  You can sit down while he does this.

14         MR. McADAMS:  Thank you, your Honor.

15         Your Honor, as I indicated before, Count I is

16  the offense of using means of interstate commerce to

17  entice an individual under the age of 18 to engage in

18  illicit sexual activity.  There are four elements to

19  that offense:  The first is that the Defendant

20  knowingly persuaded, induced, enticed or coerced the

21  person in question to engage in sexual activity; the

22  second element is that he did so by using a facility or

23  means of interstate or foreign commerce; the third is

24  that the person at the time was less than 18 years old;

25  and the fourth element is that the sexual activity was

a criminal offense. The criminal offense is defined by state law. In Rhode Island the age of consent is 16 years old. Sexual intercourse between a person over the age of 18 and a person between the ages of 14 and 16 is third-degree sexual assault, which is a felony offense.

Count II is traveling in interstate or foreign commerce for the purpose of engaging in illicit sexual conduct as defined in Title 18 USC Section 2423(f), that is, sexual contact with a minor. The elements of Count II are: (1) that the Defendant traveled in interstate commerce; (2) that the Defendant's purpose in traveling in interstate commerce was to engage in a sexual act with an individual he believed was under the age of 18; and (3) that the intended sexual act would have been a violation of federal criminal law. A sexual act would be in violation of federal law if it includes contact between a mouth and penis, the mouth and vulva, or the mouth and anus; or the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

Had the case proceeded to trial, the Government would have proven the following beyond a reasonable

1   doubt:  On October 22nd, 2016, at approximately

2   4:15 p.m. Bristol Police Officer Tyler Carreiro was on

3   routine patrol near the Bristol Town Beach and the area

4   of the East Bay Bike Path.  Officer Carreiro noticed a

5   vehicle running with windows foggy and what appeared to

6   be people moving inside, one on top of the other.  The

7   vehicle bore Massachusetts license plates.

8   Officer Carreiro knocked on the driver side window and

9   instructed the person in the driver seat to lower the

10   window.  The operator failed to comply.  The officer

11   knocked several more times before the passenger window

12   was lowered, and the officer went to that side.  He

13   observed the Defendant in the driver's seat pulling up

14   his pants.  The Defendant was sweating and appeared

15   startled.

16       The other occupant of the vehicle was later

17   identified to be a 14-year-old female whose identity is

18   known to the investigation and whom I will refer to as

19   "Minor Victim."  Minor Victim had her shirt partially

20   on and appeared to be putting her breasts back into her

21   bra and pulling her shirt up to her shoulders.

22   Minor Victim appeared nervous and curled up in the

23   fetal position facing away from the officer.

24       Mr. Leal was asked what they were doing, and he

25   stated "fooling around."  He was asked if they had

1  engaged in sexual intercourse and stated "no." He was

2  asked if Minor Victim was performing sex on him, and he

3  stated "Yeah, we are just fooling around, we are

4  friends." The Defendant was asked how old the Minor

5  Victim is, and he stated "19" and then said "18." He

6  stated that he has known Minor Victim for four months

7  and they met on Instagram.

8         Minor Victim initially gave a date of birth

9  without a year when she was asked, and then said "1997"

10 and then changed it to "1998." The officers asked

11 Minor Victim if she would exit the vehicle so that they

12 could speak to her without Mr. Leal present. Minor

13 Victim then talked to the officers while seated in the

14 cruiser door (sic) and stated that she was born in

15 2002, "I am 14." Minor Victim was asked if she was

16 okay and did not answer. She was asked if she had been

17 touched inappropriately and began to cry. She stated

18 that she had just engaged in sexual intercourse with

19 Mr. Leal. Minor Victim stated that he touched her

20 vagina with his tongue, fingers and penis. When asked

21 if she was penetrated, Minor Victim stated yes by all

22 three. The Minor Victim stated that she had had sexual

23 intercourse with Mr. Leal on multiple occasions in

24 Bristol.

25         Mr. Leal was placed under arrest and transported

to Bristol police headquarters.  Minor Victim was
transported to police headquarters and interviewed with
the consent of her parents.

Minor Victim stated in substance that she'd met
Mr. Leal on Instagram in approximately June of 2016.
They also communicated on Snapchat, Kik, and via text
message.  Minor Victim communicated with Mr. Leal
almost every day during the summer through text
message.

Minor Victim met Leal through a group called
DDLG which she explained means "Daddy Dom Little Girl,"
a community where daddies can meet young girls on a
variety of social media.  Minor Victim told the
Defendant that she's only 14 years old on numerous
occasions.

Minor Victim first met Mr. Leal in person in
Warren, Rhode Island.  At the initial meeting the
Defendant knew that Minor Victim was 14 and Minor
Victim knew that Mr. Leal was 38 years old at the time.
Sexual contact did not occur on the first meeting.
Minor Victim stated that she did not want the
relationship to be sexual but it eventually turned that
way.

Minor Victim stated she had sexual intercourse
with Leal four times.  The first sexual encounter

occurred in Leal's car in the parking lot of a middle school in Warren, Rhode Island, shortly after the 4th of July.  Mr. Leal flipped her over, took off her underwear and put his penis in her vagina.  The second sexual encounter occurred at Colt State Park in Bristol on an unknown date in the summer of 2016.  Mr. Leal took Minor Victim to the movies and the mall and then took her to Colt State Park.  She fell asleep in the car and awoke to him kissing her.  He took out his penis and tried to insert it in her vagina, but he was unable to maintain an erection.

Minor Victim stated that on or about October 16, 2016, Mr. Leal again attempted to have sex with her but was unable to maintain an erection.  Minor Victim stated that on October 22nd, 2016, the date that led to the arrest, Mr. Leal had picked her up in Warren and drove her to Colt State Park, he took off her pants and underwear, got on top of her and put his penis inside her vagina.

Upon arriving at Bristol police headquarters, Mr. Leal was processed, read his Miranda rights, and agreed to waive his rights and speak with police regarding the incident.  He said in sum and substance that he lives in Boston, Massachusetts, that he met Minor Victim on Instagram, he came across her profile

1    and sent her a message to talk in approximately June of

2    2016.  He texted with the Minor Victim and provided her

3    cell phone to the officers -- her cell phone number to

4    the officers.  He claimed that he asked Minor Victim

5    how old she was several times and that she always told

6    him she was 18.  He stated that he first met the victim

7    in Rhode Island -- excuse me -- in Warren, Rhode Island

8    in July of 2016 in person.  They arranged the meeting

9    through Instagram.

10          Mr. Leal described meeting with Minor Victim on

11   several occasions.  He traveled from Massachusetts and

12   picked her up in Warren and took her to Providence

13   Place Mall, a middle school in Warren, and Colt State

14   Park on different occasions.  He was not sure what the

15   dates were.

16          Mr. Leal stated that he penetrated Minor

17   Victim's vagina with his fingers and that he had sexual

18   intercourse with Minor Victim on three occasions, but

19   on two occasions he had problems penetrating because of

20   erectile dysfunction.  Mr. Leal stated that he was able

21   to become erect on October 22nd and had intercourse

22   with Minor Victim before the police arrived.

23          Numerous text messages between Mr. Leal and the

24   Minor Victim were obtained from Minor Victim's phone

25   and the Defendant's phone.  The texts demonstrate that

Mr. Leal sent gifts to Minor Victim, including Beats earbuds, and also asked for videos and pictures to be sent via Snapchat and other social media including Kik. In some instances Mr. Leal suggested the minor send pictures of herself sucking on a pacifier.

The following is a small sample of text messages sent to Minor Victim by the Defendant: "My first night with you, you will wear a night dress for daddy."

"I'd take the paci out, kiss you, give you back the paci, and play with your hair till you fall asleep. Then when you wake up daddy would give you a million kisses and have your favorite dinner ready for you. Then I'd feed you everything and have your favorite drink with your sip cup."

"I like the pic better with the binky. That made me really happy and melt my heart."

"You know that daddy will kiss you all night long nonstop when we sleep together for the first time. I will kiss you in every single part of your little girl body, specifically the booty."

"You better not, or daddy will spank the booty."

"But I see that you have to make yourself call me daddy dude, not cool at all. It should be natural for you to call me daddy all the time."

"I keep asking if I'm the one you really want

because you are only 14.  I kinda have to ask that myself."

"Because if you were a 25 year old I'd had dumped you a long time ago, but age for me is just a number."

"One stupid mistake can ruin all we have now."

"I'm not losing you, and it is up to us to be very careful."

"Make sure when you print you're alone in the house."

"Maybe I'm wrong, but I feel that you have a problem when I ask you to blow me or play with me."

"Don't ever say yes if your guys or guy friends ask you out, ever.  Don't ever say yes if a guy friend wants you to go watch a movie at his house or take you to the movies, ever.  Maybe you're not ready for a daddy like me.  That's y." (Sic)

"Yesterday when I kinda choke you, I really like it.  Was my first time.  I'm not a virgin on that anymore."

After he was arrested, the Defendant was detained.  He sent a letter to the Minor Victim from the Wyatt facility addressed to a nickname for the defendant -- for the victim.  Excuse me.  The letter was intercepted by the victim's parents, who provided

it to law enforcement.  Among other things the letter from Mr. Leal stated:

"You are only mine, just for me, so no one is allowed to have you.  You are my property.  You belong to me, me, me.  Don't even think about anyone else.  That's not going to happen, period."

"When I get my sentence, after I serve it, I will be most def send back to Brazil, and since you belong and you are my property, you are gonna come with me."

The Defendant also directed the victim to provide a different address where Leal could contact her and instructed the victim not to use her real name when communicating with him, and provided a form of a code in which he suggested that she write letters to him.

Finally, your Honor, the Indictment does contain a forfeiture count, and it is the Government's intention to forfeit the smartphone that was seized from the Defendant on the day of his arrest.

Thank you.

THE COURT:  Thank you, Mr. McAdams.

Mr. Leal, would you please stand up.  All right.  Mr. Leal, did you listen carefully to the facts that Mr. McAdams stated were the facts that the Government

1    would prove if this case were to go to trial?

2              THE DEFENDANT:  Yes, I did, your Honor.

3              THE COURT:  Do you agree that those are all the

4    facts of this case?

5              THE DEFENDANT:  Yes, I do.

6              THE COURT:  Is there anything that he said or

7    described in his recitation of facts that you believe

8    is untrue or incorrect for any reason at all?

9              THE DEFENDANT:  No.

10             THE COURT:  I'm going to ask you now how you

11   wish to plead to the charges against you, guilty or not

12   guilty.

13             THE DEFENDANT:  Guilty.

14             THE COURT:  It is the finding of this Court in

15   the case of the United States versus Rafael Leal that

16   the Defendant is fully competent and capable of

17   entering an informed plea, that the Defendant is aware

18   of the nature of the charges against him and the

19   consequences of his plea, that his plea of guilty is a

20   knowing and voluntary plea supported by an independent

21   basis in fact containing each of the essential elements

22   of the offense.  His plea is therefore accepted.  He is

23   hereby adjudged guilty of those offenses.

24             Sentencing in this case will be set down for

25   September 11, 2017 at 9:30 a.m.   In the meantime,

1    Mr. Leal, the Probation Office will be preparing a

2    presentence investigation report that I'll utilize for

3    purposes of sentencing, and I encourage you to

4    cooperate with the Probation Office in the preparation

5    of that report.

6         All right.  Is there anything further that we

7    need to take up?

8         MR. McADAMS:  Nothing from the Government.

9         MR. THOMPSON:  No.  Thank you, Judge.

10        THE COURT:  We'll be in recess.

11        (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    C E R T I F I C A T I O N

2

3

4

5

6              I, Denise P. Veitch, RPR, do hereby certify

7    that the foregoing pages are a true and accurate

8    transcription of my stenographic notes in the

9    above-entitled case.

10

11

12

13                   /s/ Denise P. Veitch
                     Denise P. Veitch, RPR
14

15

16                   January 19, 2018
                     Date
17

18

19

20

21

22

23

24

25